## PROVIDENCE COUNTY.

SILVER SPRING BLEACHING AND DYEING COMPANY *vs.* THE
WANSKUCK COMPANY.

The right of a riparian owner to have the water of the stream flow through or by his land
   in its natural purity, and without appreciable pollution caused by owners above him, is
   well settled, is a part of his property, and will be protected by injunction.
Nor is this right modified by the fact that the flow of the stream has been increased by
   reservoirs built along its upper course.
*Richmond Manufacturing Company* v. *Atlantic Delaine Company*, 10 R. I. 106 affirmed.

BILL IN EQUITY for an injunction.

*February* 11, 1882.   POTTER, J.   The complainant and re-
spondent are manufacturing corporations chartered by the Legis-
lature of Rhode Island, and doing business in this State upon
West River, so called, running into the cove at Providence, the
respondents owning the upper mill on the stream.

The bill alleges that the complainant and its predecessors in
title have ever since about A. D. 1850 carried on the business of
bleaching and finishing cotton and other ·cloths at its mill upon
said river, that the complainant itself has carried on the business
of bleaching, dyeing, and finishing goods there since about A. D,
1864, and that in its business it has always used the waters of
the river for said purposes, and that a great degree of purity in
the water is necessary therefor; that up to the time of the doings
of the respondent now complained of the water of the river was

of great clearness and purity; and the complainant claims by reason of its ownership of the land and banks of the river, and by its continuous use of said waters, the right to the free and natural course of said waters unpolluted as the same formerly flowed.

The bill further alleges that the respondent corporation was created in May, 1863, and about A. D. 1864 became the owner of lands on said river above the works of the complainant, with mills, buildings, &c., thereon, and from then to the present time has carried on there the business of manufacturing, dyeing, coloring, and finishing woollen cloths and goods; that a portion of the buildings had been erected in 1862, previously to the respondent's ownership, and in 1863 were first used for the purposes aforesaid, and that prior thereto the waters were pure, and by reason thereof well adapted to the complainant's business, and were used by the complainant for the ordinary purposes of bathing, family washing, and drinking, that horses and cattle drank thereof, and fish lived therein; that from about 1800 to 1849 the respondent's premises had been used for a cotton mill, from 1849 to 1863 for a planing mill, ice-houses, and a small dye-house, and that the owners never polluted said waters nor claimed any right to do so; that about 1864 the respondent erected large buildings for its said works, and has used and continues and intends to use dye-stuffs, chemicals, &c., injurious to the purity of the water, and to the use of it by the complainant; that from 1864 until now it has emptied into said river impure and deleterious substances, materially injuring the waters and destroying their clearness and purity, and rendering them entirely unfit for the business of the complainant, injuring the quality of its goods, and impairing and destroying the rights of the complainant to the use of the waters; that about 1874 the respondent largely increased its works, and the quantity of deleterious matters emptied into the river, whereby the business of the complainant has been damaged, the market value of its goods diminished, and it has been greatly damaged; that the complainant frequently complained to the respondent of said injuries, and has never acquiesced, but from time to time has protested against said use of the water. The bill prays for a perpetual injunction.

The respondent denies that the waters were of the purity as claimed until injured by it, and denies that the waste and refuse matter of its manufactory have been emptied into the river; and it avers that the dye-house formerly on the premises was used for many years, and large quantities of dye-stuffs, &c., were thrown into the river, defiling the waters, without any objection from the complainant or former owners of the complainant's lands.   It denies that the complainant gave notice of the injuries done to the complainant before 1872, but admits that the complainant did give notice then, and in 1875.   It avers that it has used all practicable means to keep the water pure, and says that the injuries, if any, are not caused by its acts, but that the waters are rendered impure by the filth from the mills above, and that if the respondent's mills were closed the water would not be perceptibly purer. A further avers that certain changes made by the complainant have diminished the volume of water flowing in the river, and so tended to increase its impurity; and that the complainant has no exclusive right to the control of waters which are to a large extent furnished by reservoirs and improvements made at the joint expense of the respondent and the other owners above.

This case has occupied a great deal of the time of the court, and has been very thoroughly prepared on both sides.   The importance of the case to the parties, and the importance of the questions involved to the general public, fully justify the expenditure of time and trouble.

That the respondent does turn into the river large quantities of deleterious substances calculated to pollute the water and to render it more unfit for use by the mill-owners below, and that the complainant is materially damaged thereby, we consider proved by a great preponderance of evidence.   In such a case the remedy by an action at law would be inadequate.

It is claimed by the respondent that the complainant is not entitled to relief because it has stood by and seen the respondent expend large sums of money on the respondent's establishments, knowing that the pollution of the water would be the necessary consequence of running them.   This objection must be made on the theory that it is so much the custom of manufacturers to pollute the rivers, that it is to be presumed they will do it, and there-

fore the complainant should have been on its guard, and should have given notice if it intended to object to the pollution. But ordinarily it is not to be presumed that one person intends to violate the rights of another until he threatens to do it, and the owners of the lower mill could claim no damages until they were actually injured. And it seems that there have been continual complaints. The complainant was not obliged to sue immediately, and the motives which may have induced it to postpone suing do not seem material to the present case.

The complainant alleges that before the building of the respondent's mills, the water of the river was practically sufficiently pure for the purposes for which the complainant wished to use it; that in about ten years after first building, viz., in 1874, the respondent largely increased its works and the consequent pollution of the river. And from all the evidence we cannot see that the complainant has been guilty of laches which should prevent this suit.

The respondent also says that the substances it throws in do not appreciably increase the pollution of the river. We do not think this is according to the evidence.

It also says that the complainant is itself a sinner, and pollutes the water below. That is a matter entirely between the complainant and the lower owners on the river, unless, indeed, it makes the river injurious to public health, or otherwise becomes an injury to the rights of the public, when the proper officers of the government might interfere.

The right of every owner of land bordering on a stream to the use of the water is well settled; and the fact that he also owns a mill does not lessen his rights. *Primâ facie* he owns to the centre of the stream, and if he owns on both sides, owns the whole of the land under it. And he has a right to have the water pass his land in its natural pure state. Pollution, to be the subject of a suit, must of course be appreciable. And we feel bound to reaffirm the decision heretofore made in the case of *Richmond Manufacturing Company* v. *Atlantic Delaine Company*, 10 R. I. 106, and the principles there set forth.

But the respondent contends that while this might be very good law in former days, when we were simply an agricultural

people, and the water was only used for drinking, domestic wash-
ing, and the watering of· horses and cattle, there has been a com-
plete change of circumstances; that we are largely interested in
manufactures, and the wealth of the · State depends mainly on
their prosperity; and that the lesser use should give way to the
more valuable use; and it instances our old flowage laws.   These
laws, however, did not affect the purity of the water.   When the
country was first settled, a grist-mill to grind corn and a saw-mill
to saw timber were absolutely necessary to the existence of the
settlers.   Bread and cabins or houses of some sort they must
have.   Afterwards, but not until the lapse of many years, the
grist-mill and saw-mill ponds were used to carry mill machinery,
and the law gradually came to be construed so as to justify it.

The right of the riparian owner, be he farmer or mill-owner,
to have the water pass his land in its natural state, and to a cer-
tain use of it as it passes, not, however, injuring it for the use
of others, is just as much his property as the land itself.   This
court cannot alter the law.   Nor can the legislature take this
right from him any more than it can take his land.   If needed
for public use, the State can take this right upon making com-
pensation.   But they cannot take it, or, which is in this case the
same thing, the use of it, from one man and give·it to another for
private purposes, even on the latter's paying for it.   That may
be a matter of private agreement, but the State can interfere
only to protect the rights of all parties, not to take them away.

But it is further contended that West River, in its present state,
cannot be called a natural stream, but that it is almost entirely
an artificial stream, flowing from and supplied by reservoirs con-
structed above, at the joint expense of all the mills, and that
therefore the general law does not apply in this case.   We cannot
so understand it.   Unless at the time of the construction of the
reservoirs there was some agreement among the mill-owners, by
which they would be estopped as against each other from claiming
their legal rights, we cannot see that the mere fact of turning
more water into the stream would alter the former legal rights
of the parties.   If, there being reservoirs, the water could in some
way be apportioned, and sufficient taken down to each mill in
pipes, to answer the purposes of washing, bleaching, and other

purposes for which pure water is necessary, without injury to the rights of the upper mills — if that were practicable, it would be one mode of solving the present difficulty. But that must be by agreement among the owners themselves. Another solution of the difficulty is suggested by the respondent's counsel in their brief.[1] But this also can only be effected by agreement.

The complainant, therefore, is entitled to the relief prayed for.

*Decree accordingly, entered March 4, 1882, to take effect from May 1, 1882, but without prejudice to the complainant's right to recover for any damage suffered meanwhile.*

*Benjamin F. Thurston, Charles Hart, Edward C. Ames, Samuel Ames & Thomas A. Jenckes*, for complainant.
*Edwin Metcalf & Charles P. Robinson*, for respondent.

---

[1] *i. e.* the discharge of all the fouled waters into a sewer to be constructed along the line of the stream.